UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| RODERICK GRANT,<br><br>   Plaintiff,<br><br>v.<br><br>TECH MAHINDRA (AMERICAS), Inc.,<br><br>   Defendant. | Civil Action No.<br><br>**COMPLAINT**<br>**AND**<br>**DEMAND FOR JURY TRIAL**<br><br>**(CLASS ACTION)** |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

Plaintiff Roderick Grant brings this action on behalf of himself and a class of similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Tech Mahindra (Americas), Inc.

### NATURE OF THE ACTION

1. Tech Mahindra, Ltd. is an information technology ("IT") company located in India. Defendant Tech Mahindra (Americas), Inc. (hereinafter "TMA") is Tech Mahindra, Ltd.'s wholly owned subsidiary. TMA provides IT outsourcing and consulting services to clients within the United States. TMA employs approximately 5,100 employees in the United States. While roughly 1-2% of the United States population, and roughly 12% of the relevant labor market, is South

1

Asian and Indian, approximately 90% (or more) of TMA's United States-based workforce is South Asian and Indian. As discussed further below, this grossly disproportionate workforce is the result of TMA's intentional pattern or practice of employment discrimination against individuals who are not South Asian or Indian, including discrimination in hiring, promotion, and termination decisions.[1] In addition, TMA utilizes employment practices, discussed below, that result in a disparate impact on individuals who are not South Asian or Indian.

2. Tech Mahindra's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff seeks, on his own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress TMA's pervasive pattern or practice of discrimination.

## THE PARTIES

3. Plaintiff Rodrick Grant was born in the United States, and is of American national origin and African American race. Mr. Grant was employed by TMA in Fargo, North Dakota. Mr. Grant lived in Fargo at all times discussed below, but moved to California in June 2018. Mr. Grant is a member of a protected class as recognized by 42 U.S.C. § 1981 and Title VII. Mr. Grant has exhausted his administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing charges against TMA with the U.S. Equal Employment Opportunity

---

[1] As used herein, "South Asian race" refers to individuals who trace their ancestry to the Indian sub-continent. *See, e.g., St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid").

2

Commission, which was cross-filed with the North Dakota Department of Labor and Human Rights, and receiving notices of their right to sue from the EEOC and the NDDLHR.

4. TMA is an American company incorporated in New Jersey. TMA is headquartered in Plano, Texas and incorporated in New Jersey. TMA is registered to do business in North Dakota and maintains an office in Fargo.

## JURISDICTION

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f), *et seq.*, and 42 U.S.C. § 1981(a).

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a corporation that is a citizen of a different state.

7. This Court has personal jurisdiction over TMA because it engages in continuous and systematic business contacts within North Dakota and maintains a substantial physical presence in this State. Additionally, Mr. Grant's claims arise, in part, out of TMA's activities in North Dakota.

## VENUE

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because TMA resides in this District, conducts business in this District, engaged in discriminatory conduct in this District, and employment records relevant to TMA's discrimination are maintained in this District. Assignment to this Division is proper pursuant to Civil Rule 3.1(A) because a substantial part of the events giving rise to this matter occurred in this Division. For

example, and as discussed further below, Mr. Grant was employed by TMA in Fargo throughout his employment until his discriminatory termination.

### TECH MAHINDRA'S BUSINESS MODEL AND DISCRIMINATORY SCHEME

9. TMA has approximately 25 offices in the United States and employs approximately 5,100 individuals. TMA made almost $1 billion in revenue in the past fiscal year, and comparable amounts in prior years.

10. TMA contracts with U.S. companies to provide IT-related services. Once TMA secures a contract with a client, it hires individuals to fill positions to service the client. Both external applicants and existing employees must apply and interview for these positions. Once a position servicing a client comes to an end (or if an employee is removed from a position), employees are placed in a non-productive status referred to as being on the bench. Once on the bench, employees must again seek new positions within TMA, going through an application and interview process, just as external applicants must.

11. TMA prefers to employ and promote South Asians and Indians. It effectuates this preference in at least four ways. First, TMA engages in a practice of securing H-1B visas (and other visas) for South Asian and Indian workers located overseas who will then be used to staff positions in the United States. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the annual cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to

4

be awarded later that year. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

12.     To fulfill its employment preference for South Asian and Indians, TMA seeks to maximize the number of visas it receives each year from the federal government. TMA is consistently one of the top ten H-1B visa recipients. TMA submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process (despite the fact that this practice constitutes visa fraud). In this way, TMA has been able to secure visas for far more individuals than it actually has a present need for. For instance, in FY 2017, TMA obtained 4,931 approved H-1B petitions. In FY 2016, TMA obtained 3,344 approved H-1B petitions. In FY 2015, TMA obtained 2,553 approved H-1B petitions.[2] Given that TMA employs only 5,100 employees in the U.S., TMA could not possibly have positions for each of the thousands of individuals for whom it secures a visa each year. Rather, these individuals are placed in TMA's inventory of visa workers for use on future projects in the U.S.

13.     All, or substantially all, of the individuals for whom TMA secures visas are South Asian and Indian. TMA gives these individuals preference for open positions in the U.S. (over locally hired non-South Asian employees and external applicants). Similarly, non-South Asian and non-Indian individuals are often displaced from their current positions in favor of South Asian and Indian visa-ready individuals.

14.     Second, TMA gives preference to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applicants. As a result, on information and belief, TMA

---

[2] *See Buy American, Hire American*, U.S. CITIZENSHIP & IMMIGRATION SERVS. (July 5, 2018), https://www.uscis.gov/legal-resources/buyamerican-hire-american-putting-american-workers-first (containing links to the annualized lists).

5

hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market. These locally hired South Asian and Indian employees are then given preference for open positions in the U.S. (over locally hired non-South Asian employees).

15.   Third, TMA gives preference to South Asians and Indians over non-South Asian and non-Indians in making promotion decisions. This results in diminished career prospects and lower pay for non-South Asian and non-Indian individuals, among other harms. The vast majority (if not all) of TMA's managerial and supervisory positions in the U.S. are filled by South Asian and Indian individuals.

16.   Fourth, because of its discriminatory preference for South Asians and Indians, TMA terminates non-South Asians and non-Indians at disproportionately high rates, compared to South Asians and Indians. Additionally, because of TMA's preference for filling positions with South Asians and Indians, non-South Asian and non-Indians are disproportionately relegated to the bench and disproportionately unable to locate new assignments. On information and belief, individuals who remain on the bench for too long are terminated.

17.   TMA's U.S. workforce reflects the result of its discriminatory scheme. While only about 12% of the relevant labor market (the IT industry) is South Asian, approximately 90% (or more) of TMA's United States-based workforce is South Asian and Indian, as is, the vast majority (if not all) of its managerial and supervisory-level staff.

**PLAINTIFF GRANT'S EXPERIENCES**

18.   At the time Mr. Grant applied and worked for TMA, he had almost 20 years of Informational Technology (IT) experience. He completed three years of undergraduate coursework in Computer Science at Winston-Salem State University, as well as extensive additional IT

training, obtaining certificates for skills in Service Delivery and Management, Information Technology Infrastructure Library (ITIL) / Focus in Service Management (ITSM), Six Sigma Yellow Belt, UNIX Shell Scripting (Bash, Kornshell), and MySQL Oracle database. Between 1980 and 2012 (when Mr. Grant applied to TMA), he had been employed in nine different positions involving IT work, including IT jobs for large companies such as Chrysler, Kelly Services, K-Mart, Ford Motor Company, and IBM Global Services.

19. TMA employed Mr. Grant as a Senior Technical Associate (sometimes referenced as "Systems Analyst," though both titles reference the same position and duties). His employment began in August 2012 and ended on June 29, 2015.

20. In August 2012, Mr. Grant started work at TMA's Fargo, North Dakota worksite. At that time, about 20 TMA employees worked at the Fargo site. Of those 20 employees, about 14 employees were of South Asian and Indian descent, *i.e.* 70% of TMA's Fargo employees were Indian, and only about 6 employees (including Mr. Grant) were not of South Asian or Indian descent. All of TMA's Fargo-site managers and lead workers were of Indian descent.

21. During Mr. Grant's employment, the number of employees at TMA's Fargo site expanded up to about 100 employees, as did the (already highly disproportionate) ratio of South Asian and Indian to non-South Asian and non-Indian employees. By early 2015, about 90% of TMA's Fargo-site employees were South Asian and Indian. Nearly all of these South Asian and Indian employees were H-1B visa employees who had come to the U.S. from India.

22. At the point Mr. Grant was discharged on June 29, 2015, there were still approximately 100 TMA employees at the Fargo worksite, and only about three of the employees were not South Asian or Indian. The Fargo workforce as a whole, between 2012 and June 2015, had grown from approximately 70% Indian employees (about 14 of 20 individuals) to

7

approximately 90% in early 2015, and to approximately 97% Indian employees (about 97 of 100) when Mr. Grant was discharged on June 29, 2015.

23. When Mr. Grant was hired in August 2012, TMA told him that his "opportunities [were] unlimited" if he performed well in his role for a year. He was assigned to a TMA project servicing its client AT&T.

24. Mr. Grant performed well in his job and received positive feedback throughout his tenure with TMA. During Mr. Grant's employment, he never received any discipline or warnings regarding his performance.

25. Despite Mr. Grant's positive employment history with TMA and his strong IT qualifications, the company failed to select him for many job-promotion and transfer opportunities.

26. For example, Mr. Grant applied for the following positions, each of which would have constituted a promotion had Mr. Grant been selected:

    a. Team Lead position (November 2013)

    b. Service Manager/Team Manager position (April 2014)

    c. Senior Solution Architect (Team Lead) position (October 2014)

    d. Service Management (a/k/a Service Delivery Manager) position (October or November 2014)

    e. Senior Technician – Operations Support (Team Lead) position (December 2014)

    f. Team Lead position (January or February 2015)

27. Mr. Grant was not selected for any of these positions. On information and belief, all, or substantially all, of these positions were filled with South Asians of Indian descent, many of whom had traveled to the U.S. from India on a visa.

28. In mid-June 2015, TMA abruptly provided Mr. Grant with verbal and written notice that his employment was to be terminated effective June 29, 2015.

29. In mid- June, 2015, Mr. Grant received a phone call from TMA stating his position was being "eliminated" due to "financial reasons." This assertion was pretextual. TMA had just signed another large contract with AT&T, the client serviced by all the Fargo employees of TMA. Mr. Grant's position was needed, as always, to complete the (extended) AT&T contractual work. Indeed, in the last several weeks of his employment, Mr. Grant was required to train several substantially less qualified individuals to take over his position.

30. Given this news of impending termination, Mr. Grant sought numerous positions with TMA between mid- and late-June 2015. For example, these positions included the following:

   a. Solutions Architect (Charlotte, NC)

   b. Senior Data Analyst (Kansas)

   c. Production Support position (Denver, CO)

   d. Production Support position (Texas)

   e. DevOps position (Dallas, Texas)

   f. Project Manager (Charlotte, NC)

   g. Scrum Master (Dallas, TX)

   h. Senior Solution Architect (Denver, CO)

31. Mr. Grant was not selected for any of these positions. On information and belief, all, or substantially all, of these positions were filled with South Asians of Indian descent, many of whom had traveled to the U.S. from India on a visa.

32. Consistent with its mid-June 2015 notice, TMA terminated Mr. Grant's employment on June 29, 2015.

## CLASS ACTION ALLEGATIONS

33. Mr. Grant bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TMA's systematic pattern or practice of discriminatory employment practices against individuals who are not of South Asian race or Indian national origin, as well as its utilization of employment practices resulting in a disparate impact against such individuals. This action is brought on behalf of the following class:

> All persons who are not of South Asian race or Indian national original who sought a position with (or within) TMA and were not hired, who sought a promotion within TMA and were not promoted, and/or who TMA involuntarily terminated.

34. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Mr. Grant, it is believed to be in the thousands. Furthermore, members of the class are readily identifiable from information and records in TMA's possession.

35. There are numerous questions of law and fact common to the class. Among the common questions of law or fact are: (a) whether TMA has engaged in a pattern or practice of discrimination against non-South Asian and non-Indian individuals in its hiring, promotion, and termination decisions; (b) whether TMA's employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (c) whether TMA has violated 42 U.S.C. § 1981; (d) whether TMA has violated Title VII; (e) whether equitable and injunctive relief is warranted for the class; and (f) whether compensatory and/or punitive damages are warranted for the class.

36. Mr. Grant's claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices, *i.e.*, they were denied the opportunity to fairly

compete for and obtain employment with TMA, were denied positions and promotions within the company, and/or were terminated by the company.

37. Mr. Grant will fairly and adequately protect the interest of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Mr. Grant is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent him and the class.

38. Because of TMA's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Mr. Grant and the class, Mr. Grant and the class have suffered substantial harm for which punitive damages is warranted.

39. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TMA has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Mr. Grant and the class. Members of the class are entitled to declaratory and injunctive relief to end TMA's discriminatory policies and practices.

40. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damage claims of individual class members because the issue of whether TMA engages in a pattern or practice of discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member.

The instant case will be manageable as a class action. Mr. Grant know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

41. In the alternative, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Mr. Grant's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TMA discrimination. Certification under this rule is also appropriate to decide whether TMA has adopted a systemic pattern or practice of racial and national origin discrimination and/or has engaged in practices that have resulted in a disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## CAUSES OF ACTION
### COUNT I
### (Disparate Treatment on the Basis of Race)
### (Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)

42. Mr. Grant re-alleges each preceding paragraph as though fully set forth herein.

43. Throughout the class liability period, TMA has engaged in a pattern or practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring South Asian individuals in hiring, promotion, and termination decisions, and (b) knowingly and intentionally disfavoring non-South Asian individuals (including Mr. Grant) in hiring, promotion, and termination decisions.

44. As a result of TMA's intentional discrimination, Mr. Grant and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TMA.

45. TMA's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## COUNT II
### (Disparate Treatment on the Basis of Race and National Origin)
### (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

46. Mr. Grant re-alleges each preceding paragraph as though fully set forth herein.

47. Throughout the class liability period, TMA has engaged in a pattern or practice of discriminating against individuals who are not of South Asian race or Indian national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in hiring, promotion, and termination decisions, and (b) knowingly and intentionally disfavoring individuals who are not of South Asian race or Indian national origin (including Mr. Grant) in hiring, promotion, and termination decisions.

48. As a result of TMA's intentional discrimination, Mr. Grant and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TMA.

49. TMA's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

## COUNT III
### (Disparate Impact on the Basis of Race and National Origin)
### (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

50. Mr. Grant re-alleges each preceding paragraph as though fully set forth herein.

51. Throughout the class liability period, TMA has used the policies and practices described above related to hiring, promotion, and termination of individuals that have had a disparate impact on the basis of national origin and race (harming those who are not of South Asian race or Indian national origin) that are neither job-related for the positions at issue nor consistent with business necessity.

52. As a result of these policies and practices, Mr. Grant and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TMA.

53. TMA's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Mr. Grant prays for relief as follows:

a. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Designation of Mr. Grant as representative of the class;

c. Designation of Mr. Grant's counsel as counsel for the class;

d. A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. § 1981;

e. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

f. A permanent injunction against TMA and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

g. Order TMA to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

h. Order TMA to post notices concerning its duty to refrain from discriminating against employees on the basis of race and national origin, or retaliating against those who complain of racial or national origin discrimination;

i. Award Mr. Grant and the class damages – including (without limitation) punitive damages and compensatory damages – for the harm they suffered as a result of TMA's violations of § 1981 and Title VII;

j. Award Mr. Grant and the class pre- and post-judgment interest at the prevailing rate on

damages as a result of TMA's discrimination against them in violation of § 1981 and Title VII;

k. Award Mr. Grant and the class front- and back-pay, reinstatement, and such other equitable relief as the Court deems just and appropriate;

l. Award Mr. Grant attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m. Award Mr. Grant and the class such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Mr. Grant respectfully demands a trial by jury on all issues properly triable by a jury in this action.

Dated: August 10, 2018

/s/Leo F.J. Wilking
Leo F.J. Wilking
Wilking Law Firm, PLLC
P. O. Box 3085
Fargo, North Dakota 58108-3085
(701) 356-6823
(701) 478-7621 (Fax)
lwilking@wilkinglaw.com

Daniel Kotchen
    (*pro hac vice application forthcoming*)
Michael von Klemperer
    (*pro hac vice application forthcoming*)
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
(202) 471-1995
(202) 280-1128 (Fax)
dkotchen@kotchen.com
mvk@kotchen.com

Michael Brown
    (*pro hac vice application forthcoming*)
DVG Law Partner LLC
P.O. Box 645
Neenah, WI 54957
(920) 238-6781
mbrown@dvglawpartner.com

**Attorneys for Plaintiff and Putative Class**